**DISSENT and Opinion Filed December 13, 2019**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00506-CV

## IN THE INTEREST OF C.V.L., A CHILD

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-17-01086-W**

## DISSENTING OPINION

Before Justices Whitehill, Partida-Kipness, and Pedersen, III
Dissenting Opinion by Justice Whitehill

This appeal arises from a trial court judgment terminating a parent–child relationship. The trial judge found that Father committed conduct described in Texas Family Code § 161.001(b)(1)(D) and (E) and that terminating Father's parental rights was in C.V.L.'s best interest.

This case presents important questions regarding an appellate court's ability to second guess a factfinder's pivotal credibility determinations in a termination case given the supreme court's admonition that despite the heightened standard of review in termination cases, courts of appeals must nevertheless still provide due deference to the factfinder's credibility determinations. Here, the trial court viewed Father's testimony and denials about his drug use firsthand. And the trial judge also observed Father's friends and the guardian ad litem testify. The trial judge's

implicit rejection of Father's insistence that he could and would stay drug-free meant that several *Holley* factors weighed in favor of termination.

## I. BACKGROUND

The Department sued to terminate Father's parental rights based in part on his documented positive drug tests. At trial, Father testified conflictingly by admitting he was a drug addict and then denying it. He also denied continued drug use after he was sued to terminate his father–daughter relationship, but he twice tested positive for methamphetamine use while his case was pending. The last time was a month before his trial began—when everything was on the line. Father offered specious and refuted reasons for these failed drug tests. There is also evidence that Father suffers from depression, is bipolar, and has anger issues.

On the other hand, there is evidence that Father is a likeable man who cares for his daughter. People root for him. C.V.L.'s guardian ad litem recommended that C.V.L. be returned to Father. Even the trial judge said she wanted Father to succeed.

Nevertheless, the trial judge found that (i) Father placed or knowingly allowed C.V.L. to be placed in dangerous surroundings, (ii) he committed or placed C.V.L. with persons who committed endangering conduct, and (iii) terminating Father's rights was in C.V.L.'s best interest. The majority opinion holds that the evidence supporting these findings was factually insufficient. I disagree with that conclusion because the majority opinion abandons supreme court precedent and our own precedent regarding the standard of review and improperly second guesses the factfinder's findings.

## II. STANDARD OF REVIEW

The majority opinion posits that this dissent takes issue with the majority opinion's "consideration and weighing of all of the evidence when conducting this sufficiency review." That statement is only partially correct. This dissent recognizes and adheres to the heightened standard

of review stated in *In re A.B.*, 437 S.W.3d 498 (Tex. 2014). But nothing in that opinion gives courts of appeals license to second guess the factfinder's witness credibility decisions. Rather, the supreme court held otherwise:

> But, as we also recognized in [*In re C.H.,* 89 S.W.3d 17 (Tex. 2002)], while parental rights are of a constitutional magnitude, they are not absolute. *Id.* Consequently, despite the heightened standard of review as articulated in *C.H.,* the court of appeals must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re J.L.,* 163 S.W.3d 79, 86–87 (Tex. 2005).

*Id*. at 503.

## III. ANALYSIS

### A. Drug Use Evidence

The trial judge could reasonably conclude that Father is a methamphetamine addict who repeatedly lied about his methamphetamine use and who used methamphetamine at least twice after C.V.L. was removed and this termination case was filed. Here's the chronology:

- **2007**. Father testified that 2007 is "when my first kid got taken from me." He was treated for bipolar disorder. He testified that he doesn't agree with that diagnosis.

- **December 2008**. Psychiatric records indicate that Father reported being bipolar "my whole life." Father testified that he used to take lithium, but he didn't like the side effects and quit.

- **August 2016**. C.V.L. was born. Her meconium tested positive for cocaine, and a safety plan was devised that left C.V.L. with Father and required Mother to be supervised and not to live with C.V.L.

- **August 2017**. The Department received a referral about C.V.L. There were concerns about "the living environment, mold, dirty dishes, fleas, that sort of thing, as well as a concern regarding mom using drugs." At that time, Father admitted to the Department that Mother sometimes slept over. At trial, he further admitted that Mother lived with him for the first four months after C.V.L. was born because Father "had no paper saying that [Mother] couldn't stay there."

- **September 2017**. Father smoked methamphetamine with Mother, despite his knowing that the Department was investigating C.V.L.'s care. He

–3–

admitted this on the stand at trial. He also admitted that he lied to his psychologist and claimed that Mother drugged him without his knowledge.

- **October 2017**. Father tested positive for methamphetamine. There was evidence that the test results indicated recreational use rather than a one-time use, so the trial judge could reasonably infer that Father actually used methamphetamine more than the single September 2017 use Father admitted to. A CPS supervisor went to Father's house after Father failed the drug test, and although Father wouldn't allow anyone inside the house the supervisor could smell a foul odor when Father opened the door. She described the odor as "a mixture of animal, urine, [and] smoke" and agreed that it smelled like "a dirty house."

- **Also October 2017**. C.V.L. was removed and this termination case was filed. So Father was on notice that he was under scrutiny and needed to stay drug-free.

- **January–May 2018**. Father passed three drug tests.

- **Early summer 2018**. Father completed his court-ordered services.

- **July 2018**. Father passed another drug test, and C.V.L. was returned to him.

- **August 2018**. Father passed another drug test.

- **September 2018**. Father used methamphetamine again. This was proved by both a drug test and a Metrocare Assessment for Chemical Dependency. Father tried to explain this positive test away by saying (i) he had sex with Mother (a known drug addict) a couple of times during the previous summer and (ii) less than a week before the drug test he did some work on a van that contained a can full of used crack pipes and meth pipes. Expert testimony discredited these explanations. The Department removed C.V.L. again.

- **October 2018**. Father tested positive for both methamphetamine *and* cannabinoids. So the trial judge could reasonably conclude that Father used not only methamphetamine but also THC or marijuana.

- **November 2018–February 2019**. Father passed monthly drug tests.

- **January 2019**. A Metrocare initial assessment document dated January 14, 2019, says that Father smoked methamphetamine "1–3 times in the past month." So, this evidences at least a third use of illegal drugs, Father's second after this termination case started. Moreover, the assessment shows Father's diagnosis as "Amphetamine-type substance use disorder, Moderate."

- **March 2019**. Father failed another drug test by testing positive for methamphetamine. Given that Father had passed his previous four drug tests, this test corroborates the January 2019 Metrocare document suggesting at least one additional use in December 2018 or January 2019.

–4–

> An expert agreed that, based on the March 2019 test result, "we can say with confidence that there was more than one use from the original October 2017 test."

Thus, the trial judge could reasonably have believed all of this evidence and concluded that Father recreationally used methamphetamine before September 2017 and lied about it.

Then, after this case started, Father was drug-free for several months, but after he got C.V.L. back he used methamphetamine again in September 2018 and lied about it. A drug test showed he also used THC or marijuana somewhere in this time frame. A Metrocare document indicated that he used methamphetamine one to three times in the December 2018–January 2019 time frame—shortly before trial began.

And not only did Metrocare diagnose Father as having a moderate amphetamine-type substance abuse disorder, but Father admitted on the stand that he was "a user not an abuser," and, "I am an addict, I guess."

Finally, there was evidence that Father refused to accept his diagnosis for bipolar disorder and maintained and concealed an unsanitary residence, specifically the August 2017 referral that reported mold and fleas and the CPS supervisor's testimony about a foul odor in October 2017.

## B.     Endangerment under § 161.001(b)(1)(E)

There is no need to repeat all the legal principles involved in a Family Code § 161.001(b)(1)(E) analysis. Suffice to say, the majority opinion correctly holds that the evidence is legally sufficient to support the finding that Father engaged in conduct that endangered C.V.L.'s physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). Evidence that a parent used drugs during an ongoing termination suit, when he knows he is at risk of losing his child, is legally sufficient to support an (E) endangerment finding. *See, e.g.*, *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

But, inconsistently, the majority concludes that the (E) evidence here is factually insufficient because there is *no evidence* that Father's past use of methamphetamine endangered C.V.L. That cannot be logically correct; if evidence of drug use during a termination case is legally sufficient evidence of endangerment, then it must be some evidence that such drug use endangers the child.

The question on factual sufficiency review is whether the *disputed* evidence is so powerful that the factfinder couldn't reasonably credit the evidence favoring termination. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Here, there is credible evidence that Father used methamphetamine at least twice after C.V.L. was removed, specifically (i) the September 2018 drug test and Metrocare Assessment for Chemical Dependency and (ii) the January 2019 Metrocare record plus the March 2019 drug test.

More importantly, there is scientific evidence (in the form of a drug test) that Father used methamphetamine after C.V.L. had been returned to him and before the trial when he knew his parental rights were in jeopardy. There was also scientific evidence from which the factfinder could reasonably conclude that Father's explanations were not credible. From these facts, the factfinder could reasonably have determined that Father was a recidivist drug addict—even when C.V.L.'s best interest was on the line—and that he would continue to be so if C.V.L. remained in his custody post-trial. So the evidence of endangerment is factually sufficient. *See In re A.M.*, 495 S.W.3d at 580 (employing same analysis).

The majority also asserts that (E) cannot be satisfied without a "conscious course of conduct." *See In re K.S.*, No. 05-15-01294-CV, 2016 WL 1613126, at *14 (Tex. App.—Dallas Apr. 21, 2016, pet. denied) (mem. op.) ("[A] voluntary, deliberate, and conscious 'course of conduct' by the parent is required."). But there is evidence of a conscious course of conduct here. Parental conduct both before and after a child has been removed can be considered, *id.*, and here

there was evidence that Father used methamphetamine recreationally before C.V.L. was removed and used it at least twice after her removal. There was no contrary evidence so powerful that the trial court couldn't properly credit this recidivist drug use evidence. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

Indeed, there was credible evidence from which the trial court could reasonably conclude that Father's methamphetamine use was more than an isolated act and instead was voluntary, deliberate, and a conscious course of conduct. Thus, the evidence was factually sufficient to support the trial court's (E) endangerment finding. *See In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied).

## C.    Best Interest

The majority opinion correctly concludes that the evidence is legally sufficient to support the finding that terminating Father's rights is in C.V.L.'s best interest. For purposes of that analysis, the majority opinion concludes, again correctly, that the trial court was entitled to disbelieve Father's testimony that he would not relapse in his drug use. The trial court was even permitted to disbelieve that testimony for factual sufficiency purposes too.

But in its factual sufficiency review, the majority opinion errs by concluding that the trial court could not disbelieve Father's testimony because "the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding." I disagree.

The *Holley* best interest factors are: (i) the child's desires, (ii) the child's needs now and in the future, (iii) danger to the child now and in the future, (iv) the parent's parental abilities, (v) the programs available to assist the parent promote the child's best interest, (vi) the plans for the child

by the parent or the agency seeking custody, (vii) the stability of the home or proposed placement, (viii) the parent's conduct indicating that the relationship is not a proper one, (ix) any excuse for the parent's conduct, and (x) any other relevant consideration. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

Some evidence supported *Holley* factors weighing in Father's favor. Although very young, the child seemed bonded to him. Father showed willingness to take advantage of programs to assist him. Father had some plans for the child's care, and the Department did not put on evidence of its plans for the child.

But against these factors the trial court was entitled to give weight to the evidence of Father's continued drug use, his lies about the failed drug tests, and above all the possibility or probability of relapse. Even after the Department took C.V.L. away and sued Father to terminate his rights forever, Father was unable to stay drug-free and was unwilling to admit his mistakes. His uses during this case's pendency were knowing and voluntary acts indicating that his parental relationship with C.V.L. was not a proper one.

Moreover, if Father was likely to relapse in the future, several other *Holley* factors supported termination. A parent under the influence of illegal drugs cannot effectively see to the child's emotional and physical needs. The parent's possible incapacitation and incarceration pose distinct emotional and physical dangers to the child. A relapse would render Father's home unstable. As for excuses for Father's behavior, there are none that bode well for C.V.L.'s best interest: He has been diagnosed with bipolar disorder that is not currently being treated. He was in a lengthy relationship with C.V.L.'s drug-addicted Mother. Although he orally agreed to a safety plan that prohibited him from living with Mother after C.V.L was born, he continued living with Mother for four months because he did not have a piece of paper telling him that he could not

live with her. And he refused to admit his drug use during the pendency of this case despite contrary drug tests.

The supposedly overwhelming evidence that contradicts the trial court's best-interest finding consists of testimony from Father, Parker, Al-Bohi, and the guardian ad litem. The value of their testimony depended heavily on their credibility. But we must defer to the trial court's credibility determinations, *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.), and the trial court had ample reason not to credit these witnesses' testimony.

Father repeatedly lied about his drug use. At one point, Father admitted to being a drug addict. Although he also insisted that he had used methamphetamine only once in his life, the evidence supported inferences that he used it recreationally before C.V.L. was removed and at least twice afterwards, not to mention his marijuana use.

The trial judge saw Father testify about his drug use; we didn't. The record is silent about the critical nonverbal factors that are essential to credibility determinations. Was Father visibly agitated on the stand? Distraught? Disheveled? We don't know, but the trial judge did. It was both the trial judge's prerogative and its duty to assess Father's credibility and demeanor on the stand, and it ultimately decided Father's testimony that he would stay drug-free, even if sincere, was not believable.

The majority opinion appears to characterize Parker and Al-Bohi as "objective, uninterested witnesses," and so it credits their testimony that Father wasn't using drugs, was capable of caring for C.V.L., was no longer in contact with Mother, and had a strong bond with C.V.L. But they were Father's long-time friends. Moreover, their testimony that Father was not using drugs was contradicted by evidence showing he used drugs at least twice less than a year before trial, and he failed a drug test the month before trial. The factual sufficiency test is not a matter of counting each side's witnesses; it requires deference to the factfinder's decision unless

–9–

the disputed evidence contradicting the finding is so objectively powerful—that is, not subject to credibility determinations—that the factfinder couldn't have reasonably credited the evidence supporting the finding. *See In re J.F.C.*, 96 S.W.3d at 266. Testimony by friendly character witnesses doesn't rise to that level.

Additionally, the guardian ad litem recommended that C.V.L. be returned to Father. He based his recommendation on his belief that Father "has finally faced his demons" and, it appears, on his observations during Father's visits with C.V.L. But he also acknowledged that this was Father's "second or third second chance."

Moreover, the trial judge or jury, not the guardian ad litem, must weigh all the evidence and make the dispositive best interest determination. It was the trial judge's prerogative to weigh the guardian ad litem's opinion along with all the other evidence—such as (i) the caseworker's contrary opinion that Father's rights should be terminated based on his drug use and potential for future drug use and (ii) the CASA volunteer's indecision as to what to do. Given that these three disinterested witnesses varied widely in their opinions on what to do, it is hard to say that the guardian ad litem's opinion is entitled to dispositive weight.

Father's testimony, even when combined with the other testimony in his favor, is not so objectively overwhelming that the trial court couldn't reasonably decide that the Department met its burden of proof.

## IV. CONCLUSION

Surely, the trial judge felt no joy in deciding that it was necessary to terminate Father's parental rights with his child. But sometimes trial judges and appellate courts have to do things they don't like. This is such a case. Sympathy for a parent's self-inflicted plight, however, is no basis for abandoning our duties as detached arbiters of whether there is sufficient evidence

–10–

supporting a factfinder's determinations where the contrary evidence depends on credibility determinations—the factfinder's exclusive domain.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

190506DF.P05